# IN THE SUPREME COURT OF IOWA

No. 07–1226

Filed January 23, 2009

**STATE OF IOWA,**

Plaintiff,

vs.

**IOWA DISTRICT COURT FOR HENRY COUNTY,**

Defendant.

---

Certiorari to the Iowa District Court for Henry County, John G. Linn, Judge.

Original certiorari action brought by State to challenge legality of district court's decision in postconviction relief proceeding, holding application of Iowa Code section 903A.2 (2001) to inmate violated Ex Post Facto Clause. **WRIT ANNULLED.**

Thomas J. Miller, Attorney General, and Mark Hunacek and Forrest Guddall, Assistant Attorneys General, for plaintiff.

Philip B. Mears of Mears Law Office, Iowa City, for defendant.

**TERNUS, Chief Justice.**

Inmate Denny Propp brought a postconviction relief action challenging a determination by the department of corrections (DOC) that he was ineligible to receive earned-time credits after he was removed from a sex offender treatment program for misconduct. *See generally* Iowa Code § 903A.2 (2005) (providing for reduction in sentence for good conduct and satisfactory participation in specified programs). Propp claimed this application of the governing statute, as amended in 2001 and 2005, violated the Ex Post Facto Clause because the offense for which Propp was incarcerated was committed prior to the amendments. The district court held the DOC's application of amended section 903A.2 to Propp violated the Ex Post Facto Clauses of the United States and Iowa Constitutions. The State brought this original certiorari action to challenge the legality of the district court's decision. Because we conclude the district court's ruling was correct, we annul the writ of certiorari.

### I. Background Facts and Proceedings.

Propp is currently incarcerated at the Mount Pleasant Correctional Facility on a twenty-five-year sentence for his 1997 conviction of third-degree sexual abuse.[1] At the time of his sentencing, section 903A.2 allowed Propp to reduce his sentence through good-time credits. *See* Iowa Code § 903A.2 (Supp. 1997).[2] Pursuant to the 1997 statute, Propp

---

[1]The record does not reveal the date of Propp's offense that resulted in this sentence.

[2]In pertinent part, the 1997 version of section 903A.2 provided:

903A.2 Good time.

1. Each inmate committed to the custody of the director of the department of corrections is eligible for a reduction of sentence for good behavior in the manner provided in this section. For purposes of calculating the amount of time by which an inmate's sentence may be

was eligible for a sentence reduction of one day for each day of good conduct and, in addition, could earn a further reduction of up to five days per month for satisfactory participation in a variety of activities and programs, including treatment programs established by the director of the DOC. *Id.* The director of the DOC was authorized to establish rules specifying what constituted "satisfactory participation" in employment, treatment, and other programs for purposes of sentence reduction. *Id.* § 903A.4 (1997).

In 2000, while Propp was still serving his sentence, the legislature amended section 903A.2. 2000 Iowa Acts ch. 1173, § 4. Under the new statute, "[a]n inmate . . . serving a category "A" sentence is eligible for a reduction of sentence equal to one and two-tenths days for each day the inmate demonstrates good conduct *and* satisfactorily participates in any program or placement status identified by the director to earn the reduction." Iowa Code § 903A.2(1)(*a*) (2001) (emphasis added). Thus, effective January 1, 2001, inmates like Propp with category "A" sentences were eligible to earn a reduction in their sentence only by demonstrating

---

reduced, inmates shall be grouped into the following two sentencing categories:

  *a.* . . . An inmate of an institution under the control of the department of corrections who is serving a category "A" sentence is eligible for a reduction of sentence equal to one day for each day of good conduct while committed to one of the department's institutions. In addition, each inmate who is serving a category "A" sentence is eligible for an *additional* reduction of up to five days per month if the inmate participates satisfactorily in any of the following activities:

  (1) Employment in the institution.
  (2) Iowa state industries.
  (3) An employment program established by the director.
  (4) A treatment program established by the director.
  (5) An inmate educational program approved by the director.

Iowa Code § 903A.2 (Supp. 1997) (emphasis added). Propp had a category "A" sentence.

good conduct *and* satisfactorily participating in any program identified by the director. *Id.* In other words, good conduct alone was no longer enough to qualify an inmate for a reduction in sentence under amended section 903A.2; earned-time credits, as they were now labeled, were also contingent on satisfactory participation in programming.

In 2005, the statute was amended once again, this time with respect to sex offenders. *See* 2005 Iowa Acts ch. 158, § 32. This amendment, effective July 1, 2005, added the following provision to section 903A.2: "However, an inmate required to participate in a sex offender treatment program shall not be eligible for a reduction of sentence unless the inmate participates in and completes a sex offender treatment program established by the director."[3] Iowa Code § 903A.2 (Supp. 2005). To implement this legislation, the DOC adopted a policy providing that inmates required to participate in sex offender treatment programs (SOTP) who refused treatment, were removed from treatment, or failed program completion criteria would not be eligible for earned-time credits.

Based upon his conviction for third-degree sexual abuse, Propp was required to participate in the SOTP. Propp began the treatment program, but was removed from the SOTP for misconduct in April 2006. Although Propp did not lose credits he had already earned, he was deemed ineligible to receive further earned-time credits until he was reinstated to the program. Prior to his removal from the SOTP, his tentative date of discharge was January 27, 2009; after his removal, his

---

[3]The practice of the DOC is to allow an inmate required to participate in a sex offender treatment program to earn credits while awaiting placement in the program rather than being deemed ineligible until completion of the program. This interpretation of the statute is not challenged in this case.

new tentative discharge date was June 12, 2012. In October 2006, Propp was reinstated to the SOTP, resulting in a new tentative date for discharge of May 20, 2009. Thus, Propp's time in prison was extended by approximately four months due to his temporary ineligibility to accumulate earned-time credits.

After exhausting his administrative remedies, Propp filed a postconviction relief action, claiming his loss of earned-time eligibility violated the Ex Post Facto and Due Process Clauses of the United States and Iowa Constitutions.[4] Propp requested that his original tentative discharge date of January 27, 2009, be reinstated. After hearing, the district court ruled application of the amended version of section 903A.2 to Propp violated the prohibition against ex post facto laws. The court ordered the DOC to reinstate Propp's original tentative discharge date. The court rejected Propp's contention that his due process rights had been violated.

The State then filed this certiorari action. Because we agree with the well-reasoned decision of the district court, we annul the writ of certiorari.

## II. Scope of Review.

The issue in this case involves a constitutional provision, the Ex Post Facto Clause. Therefore, "we review the case de novo in light of

---

[4]Propp does not claim that requiring him to participate in the SOTP is itself a violation of the Ex Post Facto Clause. *Cf. Schreiber v. State*, 666 N.W.2d 127, 130 (Iowa 2003) (holding statute requiring inmates to submit blood specimens for DNA profiling did not violate the prohibition against ex post facto laws). Nor does he claim he could not be disciplined in some manner for unsatisfactory participation. *Cf. id.* (holding imposition of discipline for refusal to supply blood specimen did not violate Ex Post Facto Clause). Propp only claims his unsatisfactory performance cannot, consistent with the Constitution, lengthen his sentence by reducing his ability to earn credits that he could have earned under the statutory scheme in effect at the time he committed his offense. This claim was not asserted in *Schreiber*.

the totality of the circumstances and record upon which the postconviction court ruling was made." *Rushing v. State*, 382 N.W.2d 141, 143 (Iowa 1986). Because neither party suggests a basis to distinguish the Federal Ex Post Facto Clause from the Iowa ex post facto clause, we will limit our discussion to the federal provision with the understanding that our analysis applies equally to the state provision.

### III. Governing Legal Principles.

The United States Constitution provides: "No State shall . . . pass any . . . ex post facto Law . . . ." U.S. Const. art. I, § 10. For constitutional purposes, an ex post facto law is

> any statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed . . . .

*Beazell v. Ohio*, 269 U.S. 167, 169, 46 S. Ct. 68, 68, 70 L. Ed. 216, 217 (1925); *accord Schreiber v. State*, 666 N.W.2d 127, 129 (Iowa 2003). It is the second type of law—one that makes the punishment for a crime more burdensome after its commitment—that is of concern here.

The purpose of the prohibition against ex post facto laws is "to assure legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28–29, 101 S. Ct. 960, 964, 67 L. Ed. 2d 17, 23 (1981). This prohibition also "restricts governmental power by restraining arbitrary and potentially vindictive legislation." *Id.* at 29, 101 S. Ct. at 964, 67 L. Ed. 2d at 23. In *Weaver*, the Court stated that "two critical elements must be present for a criminal or penal law to be *ex post facto*: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by

it." *Id.* An offender is disadvantaged when the law "makes more onerous the punishment for crimes committed before its enactment."[5] *Id.* at 36, 101 S. Ct. at 968, 67 L. Ed. 2d at 27.

In *Weaver,* the issue was "whether a Florida statute altering the availability of . . . 'gain time for good conduct' [was] unconstitutional as an *ex post facto* law when applied to [Weaver], whose crime was committed before the statute's enactment." *Id.* at 25, 101 S. Ct. at 962, 67 L. Ed. 2d at 20–21. The state statute in place at the time of Weaver's offense and sentencing provided a formula for deducting gain-time credits from the sentences of prisoners who had no disciplinary infractions and who satisfactorily performed " 'the work, duties and tasks assigned to him.' " *Id.* at 26, 101 S. Ct. at 962–63, 67 L. Ed. 2d at 21 (quoting Fla. Stat. § 944.27(1) (1975)). Gain-time credits were calculated every month and at an increasing rate: five days per month for the first two years of sentence, ten days per month for the third and fourth years, and fifteen days per month for the fifth and subsequent years of sentence. *Id.* at 26, 101 S. Ct. at 963, 67 L. Ed. 2d at 21.

In 1978, after Weaver's crime and sentencing, the Florida legislature enacted a new formula for monthly gain-time credits: three days per month for the first two years, six days per month for the third

---

[5]Subsequent to its decision in *Weaver*, the Court clarified that not any disadvantage to the offender satisfies the second element of the ex post facto analysis:

> After *Collins* [*v. Youngblood*, 497 U.S. 37, 110 S. Ct. 2715, 111 L. Ed. 2d 30 (1990)], the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of "disadvantage," nor . . . on whether an amendment affects a prisoner's "*opportunity* to take advantage of provisions for early release," . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable.

*Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 506 n.3, 115 S. Ct. 1597, 1602 n.3, 131 L. Ed. 2d 588, 595 n.3 (1995).

and fourth years, and nine days per month for the fifth and subsequent years. *Id.* at 26, 101 S. Ct. at 963, 67 L. Ed. 2d at 21. Weaver objected to the application of the new formula to him, claiming the reduced accumulation of monthly gain-time credits under the new statute extended his time in prison by over two years in violation of the prohibition against ex post facto laws. *Id.* at 27, 101 S. Ct. at 963, 67 L. Ed. 2d at 22.

In determining whether the new statute was retrospective, the Court stated "[t]he critical question is whether the law changes the legal consequences of acts completed before its effective date." *Id.* at 31, 101 S. Ct. at 965, 67 L. Ed. 2d at 24. For purposes of Weaver's claim, the Court recast this question to ask whether the Florida statute "applies to prisoners convicted for acts committed before the provision's effective date." *Id.* Because the State conceded it was using the new statute to calculate gain time available to Weaver, whose crime was committed before the new statute was enacted, the Court concluded the law changed the legal consequences attached to Weaver's crime. *Id.* The Court rejected the State's argument the statute was not retrospective because gain time was not part of Weaver's original sentence. *Id.* at 31–32, 101 S. Ct. at 965–66, 67 L. Ed. 2d at 24–25. Regardless of whether gain time is technically part of a sentence, the Court noted, "it is in fact one determinant of [Weaver's] prison term," and therefore, "his effective sentence is altered once this determinant is changed." *Id.* at 32, 101 S. Ct. at 966, 67 L. Ed. 2d at 25. The Court pointed out "a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." *Id.* *See generally Meier v. State*, 337 N.W.2d 204, 206–07 (Iowa 1983) (reversing defendant's conviction based

on counsel's failure to advise defendant prior to guilty plea to reduced charge that sentence for charged offense could be shortened through good-conduct time). The Court concluded the statute "substantially alters the consequences attached to a crime already completed," and therefore was a retrospective law. *Weaver*, 450 U.S. at 33, 101 S. Ct. at 966, 67 L. Ed. 2d at 25.

The Court then considered whether the statute made "more onerous the punishment for crimes committed before its enactment." *Id.* at 33–36, 101 S. Ct. at 966–68, 67 L. Ed. 2d at 25–27. The Court observed:

> On its face, the statute reduces the number of monthly gain-time credits available to an inmate who abides by prison rules and adequately performs his assigned tasks. By definition, this reduction in gain-time accumulation lengthens the period that someone in petitioner's position must spend in prison.

*Id.* at 33, 101 S. Ct. at 967, 67 L. Ed. 2d at 26. The Court concluded, because "the new provision constricts the inmate's opportunity to earn early release," it violates the prohibition against ex post facto laws. *Id.* at 35–36, 101 S. Ct. at 968, 67 L. Ed. 2d at 27.

The *Weaver* case is helpfully contrasted with the Court's decision in *California Department of Corrections v. Morales*, 514 U.S. 499, 115 S. Ct. 1597, 131 L. Ed. 2d 588 (1995). In the latter case, an inmate, Morales, claimed a statute changing parole hearing procedures violated the Ex Post Facto Clause. *Morales*, 514 U.S. at 503–04, 115 S. Ct. at 1600, 131 L. Ed. 2d at 593. At the time of Morales's crime and sentencing, inmates eligible for parole were entitled to annual hearings before the board of parole on their suitability for release. *Id.* at 503, 115 S. Ct. at 1600, 131 L. Ed. 2d at 593. After his sentencing, however, the statute was changed to authorize the board to defer hearings after the

initial one for a period of up to three years under specified conditions. *Id.* Morales had a hearing before the board and was found unsuitable for parole. *Id.* The board then deferred a subsequent hearing for three years pursuant to the new statute. *Id.*

Morales claimed the new law effectively increased his sentence in violation of the Ex Post Facto Clause. *Id.* at 504, 115 S. Ct. at 1600, 131 L. Ed. 2d at 593. The Court disagreed, distinguishing *Weaver* and other similar cases. It noted these cases "held that the *Ex Post Facto* Clause forbids the States to enhance the measure of punishment by altering the substantive 'formula' used to calculate the applicable sentencing range." *Id.* at 505, 115 S. Ct. at 1601, 131 L. Ed. 2d at 594. In *Morales*, by contrast, the statute had no effect on the standards for fixing a prisoner's eligibility for parole and did not change the substantive formula for securing any reductions in sentence. *Id.* at 507, 115 S. Ct. at 1602, 131 L. Ed. 2d at 595.

In a subsequent case, *Lynce v. Mathis*, 519 U.S. 433, 117 S. Ct. 891, 137 L. Ed. 2d 63 (1997), the Court considered whether a statute that retroactively canceled an inmate's provisional early release credits violated the Ex Post Facto Clause. 519 U.S. at 436, 117 S. Ct. at 893, 137 L. Ed. 2d at 69. Relying on its decision in *Weaver*, the Court determined the application of the statute, which had been enacted after the inmate was sentenced, violated the prohibition against ex post facto laws. *Id.* at 442–45, 117 S. Ct. at 896–98, 137 L. Ed. 2d at 73–75. The Court distinguished *Morales*, noting that in *Morales* it was speculative whether the change in parole hearing policy would have any effect on any prisoner's actual term of confinement. *Id.* at 443–44, 117 S. Ct. at 897, 137 L. Ed. 2d at 73–74. The Court concluded it was unnecessary to

speculate in the case before it whether the new statute had a detrimental effect on the inmate:

> Unlike the California amendment at issue in *Morales*, the [amended] statute [here] did more than simply remove a mechanism that created an *opportunity* for early release for a class of prisoners whose release was unlikely; rather, it made ineligible for early release a class of prisoners who were previously eligible—including some like petitioner, who had actually been released.

*Id.* at 447, 117 S. Ct. at 898, 137 L. Ed. 2d at 75–76. We turn now to the case before us.

**IV. Discussion.**

**A. Retrospective Application.** Our first task in determining whether amended section 903A.2 violates the Ex Post Facto Clause is to ascertain whether the law has retrospective effect. In the context of the present case, the question is whether the amended statute applies to prisoners convicted for offenses committed before the provision's effective date. *See Weaver*, 450 U.S. at 31, 101 S. Ct. at 965, 67 L. Ed. 2d at 24. Clearly, it does. The DOC has implemented a policy making *any* inmate required to participate in the SOTP who refuses treatment, is removed from treatment, or fails to meet program completion criteria ineligible for earned time. Therefore, the amended statute applies to prisoners such as Propp who were convicted for an offense committed before the amendment's effective date. The amendment is, therefore, retrospective. *See Stansbury v. Hannigan*, 960 P.2d 227, 235–36 (Kan. 1998) (holding similar statutory amendment was retrospective when applied to inmate who committed his crime before amendment's enactment).

The State argues this conclusion is inconsistent with the purpose of the ex post facto prohibition, which is to give fair warning of the effect of statutory provisions and permit individuals to rely on those provisions

until they are changed. *See Weaver*, 450 U.S. at 28–29, 101 S. Ct. at 964, 67 L. Ed. 2d at 23. It argues, "Propp was on notice since July 1, 2005 that he had to stay in the SOTP to collect his good time credits." But the focus of the State's analysis is misplaced. The question is not whether Propp was on notice when he committed the misconduct that resulted in his dismissal from the SOTP that he would lose his eligibility to earn a reduction in his sentence. The question, as the Court made clear in *Weaver*, is whether Propp knew *when he committed his crime and was sentenced* that he would not be eligible for a reduction in his sentence by merely following prison rules, but would also have to successfully participate in sex offender treatment.

**B. Impact on Punishment.** We next consider whether the amended statute increases the penalty by which Propp's crime is punishable or, stated differently, whether it makes the punishment for his crime more onerous. *Lynce*, 519 U.S. at 442, 117 S. Ct. at 896, 137 L. Ed. 2d at 72; *Morales*, 514 U.S. at 506 n.3, 115 S. Ct. at 1602 n.3, 131 L. Ed. 2d at 595 n.3. We think the statute at issue here has the same prohibited effect as did the statute in *Weaver*. At the time Propp was sentenced,[6] he could earn a one-day reduction in his sentence for each day of good conduct, and he could earn an additional reduction of up to five days per month for participation in various programs. *See* Iowa Code § 903A.2 (Supp. 1997). Thus, if Propp behaved, he received good-time credits. If he refused to participate in available programs, he did not receive any additional credits, but he still earned his one day of credit for each day of good conduct.

---

[6]We focus on the date of Propp's sentencing because the record does not reveal the date of his crime.

In contrast, by virtue of the subsequent amendments in 2001 and 2005, Propp can no longer earn credits merely by following institutional rules. Now he must follow the rules *and* satisfactorily participate in any programs required by the director. Thus, if Propp does not participate in the SOTP, but behaves in every other way, he will have a longer period of incarceration under the amended statute than he would have had under the statute in effect at the time of his sentencing.

The State argues the amended statute did not make Propp's punishment for his crime more onerous, however, because "[t]he formula that is used to compute earned time has been changed only in a way that actually benefits him." While it is true that an inmate can now earn 1.2 days of earned-time credits per day rather than one day of good-time credits as under the old formula, as we have already explained, the requirements to qualify for this credit have changed considerably. The United States Supreme Court was unpersuaded by a similar argument in *Weaver*. In *Weaver*, the state argued the net effect of the new statute was to increase availability of gain-time reductions because the new statute provided for discretionary grants of additional gain time that were unavailable under the former statute. 450 U.S. at 34–36 & n.18, 101 S. Ct. at 967–68 & n.18, 67 L. Ed. 2d at 26–27 & n.18. The Court was not convinced by this argument:

> [N]one of these provisions for extra gain time compensates for the reduction of gain time available solely for good conduct. The fact remains that an inmate who performs satisfactory work and avoids disciplinary violations could obtain more gain time per month under the repealed provision . . . than he could for the same conduct under the new provision . . . . To make up the difference, the inmate has to satisfy the extra conditions specified by the discretionary gain-time provisions. . . . In contrast, under both the new and old statutes, an inmate is automatically entitled to the monthly gain time simply for avoiding disciplinary infractions and performing his assigned tasks.

*Id.* at 35, 101 S. Ct. at 967–68, 67 L. Ed. 2d at 27.

This passage aptly describes the situation presented by Propp's challenge to amended section 903A.2. Under the old statute, Propp was automatically entitled to one day of good-conduct time for each day he avoided a disciplinary violation. Now, he has to satisfy extra conditions— satisfactory participation in programming—to receive *any* earned-time credits. Stated differently, under the original statute, Propp lost eligibility for five days of good-time credit each month he did not satisfactorily participate in a treatment program, but he remained eligible for thirty days of good-conduct credit, assuming a thirty-day month, notwithstanding his unsatisfactory participation. Under the new statute, his failure to satisfactorily participate renders him ineligible to earn *any* reduction in his sentence, even if he has no disciplinary infractions. We are convinced this difference is a substantive change in the formula used to calculate a reduction in sentence because, as in *Weaver*, it "retroactively decreas[ed] the amount of [earned]-time awarded for an inmate's good behavior." *Lynce*, 519 U.S. at 441, 117 S. Ct. at 896, 137 L. Ed. 2d at 72 (characterizing issue in *Weaver*). Therefore, application of the amended statute to Propp violates the Ex Post Facto Clause. *See Stansbury*, 960 P.2d at 236 (holding similar statutory amendment violated Ex Post Facto Clause when applied to inmate who committed his crime before enactment of amendment).[7]

---

[7]The facts of *Stansbury* are remarkably similar to this case. Under the statutory scheme in effect when Stansbury committed his crime, inmates could earn eighty percent of the available good-time credits by avoiding any disciplinary violations. *Stansbury*, 960 P.2d at 231–33. The remaining twenty percent was awarded on a discretionary basis based on several factors, including the inmate's participation in programs. *Id.* at 231. An amendment enacted after Stansbury's crime provided that an inmate's refusal to participate in assigned programs would result in the withholding of 100% of the available good-time credits. *Id.* at 232. Stansbury refused to sign a sex abuse treatment program (SATP) agreement, and as a result, his good-time credits were

For the same reasons, we reject the State's argument that the statute merely changed the conduct that was required to earn credits. As the State correctly points out, prison officials have the ability to change institutional rules without violating the prohibition against ex post facto laws. *See Gilbert v. Peters*, 55 F.3d 237, 239 (7th Cir. 1995); *Jones v. Murray*, 962 F.2d 302, 309 (4th Cir. 1992). In *Jones*, the court rejected a challenge to a statute requiring inmates to give blood specimens for DNA analysis, stating:

> The *Ex Post Facto* Clause does not prevent prison administrators from adopting and enforcing reasonable regulations that are consistent with good prison administration, safety and efficiency. . . .
> It is precisely because reasonable prison regulations, and subsequent punishment for infractions thereof, are contemplated as part of the sentence of every prisoner, that they do not constitute additional punishment and are not classified as *ex post facto*. Moreover, since a prisoner's original sentence does not embrace a right to one set of regulations over another, reasonable amendments, too, fall within the anticipated sentence of every inmate.

962 F.2d at 309–10.

The flaw in the State's attempt to categorize the amendment at issue here as a mere change in prison regulations is that the statutory scheme in effect in 1997 clearly treated compliance with institutional rules and participation in treatment programs distinctly: an inmate was rewarded for good behavior separately from the good-time credits he received for participating in programming. Analyzing the present

---

withheld. *Id.* at 230. The Kansas Supreme Court concluded the effect of the amendment upon Stansbury "was to extend his conditional release date based upon his failure to earn good time credits because of his refusal to participate in the SATP." *Id.* at 235. The court held the application of the amended statute to Stansbury violated the prohibition against ex post facto laws. *Id.* at 236.

We acknowledge there are decisions from other states that are contrary to *Stansbury* and our holding in this case. These cases are either factually distinguishable, are not consistent with Supreme Court precedent, or are simply unpersuasive.

situation from the aspect of notice, we think a person in Propp's position who was sentenced under the earlier version of section 903A.2 would have been on notice that institutional rules change over time. Accordingly, someone in Propp's position would also have been on notice that the precise conduct required to qualify for good-conduct credits may also vary over time. Nevertheless, a person in Propp's position would have had the expectation that, if he simply complied with institutional rules, he could cut his sentence in half. That is not the case under the current statutory scheme for earned-time credits. Even if Propp complies with institutional rules, he will not earn any reduction in his sentence unless he also satisfactorily participates in the SOTP. We think this case is indistinguishable from *Weaver*, in which the Court found an ex post facto violation because "an inmate who performs satisfactory work and avoids disciplinary violations could obtain more gain time per month under the repealed provision . . . than he could for the same conduct under the new provision." 450 U.S. at 35, 101 S. Ct. at 967, 67 L. Ed. 2d at 27. Because this description is equally true for Propp, we conclude the punishment for his crime has been made more onerous in violation of the Ex Post Facto Clause.

### V. Disposition.

The district court correctly determined the DOC's application of amended section 903A.2 to inmates whose crimes predated the amendments violates the constitutional prohibition of ex post facto laws. Therefore, the court did not act illegally in ordering the State to reinstate Propp's original tentative discharge date of January 27, 2009. We annul the writ of certiorari.

**WRIT ANNULLED.**